1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                          **EASTERN DIVISION**

11

12   LYNDA REGINA KLIMPEL,          )      No. ED CV 14-1217-PLA
                                    )
13                  Plaintiff,       )
                                    )
14        v.                        )      **MEMORANDUM OPINION AND ORDER**
                                    )
15   CAROLYN W. COLVIN, ACTING       )
     COMMISSIONER OF SOCIAL          )
16   SECURITY ADMINISTRATION,        )
                                    )
17                  Defendant.       )
     _____ )

18

19                               **I.**

20                          **PROCEEDINGS**

21        Plaintiff filed this action on June 19, 2014, seeking review of the Commissioner's denial of

22   her application for Supplemental Security Income ("SSI") payments.  The parties filed Consents

23   to proceed before the undersigned Magistrate Judge on July 9, 2014.  Pursuant to the Court's

24   Order, the parties filed a Joint Stipulation on March 13, 2015, that addresses their positions

25   concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under

26   submission without oral argument.

27   /

28   /

## II.

## __BACKGROUND__

Plaintiff was born on October 14, 1964.  [Administrative Record ("AR") at 430, 763.]  She has past relevant work experience as a hairstylist.  [AR at 763, 842-43.]

On June 25, 2007, plaintiff filed an application for SSI payments, alleging that she has been unable to work since June 1, 2007.  [AR at 9, 430, 756.]  After her application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 9, 59.]  A hearing was held on May 6, 2009, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 334-58.]  A vocational expert ("VE") also testified.  [AR at 350-57.]  On July 31, 2009, the ALJ issued a decision concluding that plaintiff was not under a disability since June 25, 2007, the date the application was filed.  [AR at 9-16.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 4.]  When the Appeals Council denied plaintiff's request for review, plaintiff commenced an action in this Court in case number ED CV 09-1968-PLA.  On August 27, 2010, the Court remanded the matter for further proceedings [AR at 242-54], and on October 23, 2010, the Appeals Council issued its remand instructions and, consistent with the Court's order, the matter was remanded for the ALJ to consider whether plaintiff's impairments met or equaled section 1.02A of the listing of impairments ("Listing"), to further develop the medical record, and to reconsider plaintiff's credibility.  [AR at 393-96.]  A hearing was held on March 30, 2011, before a different ALJ, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 294-329.]  The same VE who testified at the 2009 hearing also testified.  [AR at 325-28.]  On July 29, 2011, the ALJ issued a decision concluding that plaintiff was not under a disability since June 25, 2007, the date the application was filed.  [AR at 217-24.]  The Appeals Council denied review of the case and plaintiff commenced another action in this Court (case number ED CV 11-1612-PLA), which the Court remanded pursuant to the parties' stipulation for voluntary remand on May 1, 2012.  [AR at 782-83.]

On June 20, 2012, the Appeals Council issued its remand instructions to the ALJ.  [AR at 772-76.]  The remand instructions required the ALJ to update the treatment evidence, order a new

1    psychological consultative examination,[1] and expressly evaluate the medical source opinions of
2    Payam Moazzaz, M.D., and the State agency physicians, G. Taylor-Holmes, M.D., and K. Gregg,
3    M.D.; reassess plaintiff's credibility; reconsider plaintiff's RFC on the updated records; further
4    consider whether plaintiff can perform her past relevant work; and secure supplemental evidence
5    from a VE if appropriate.  [AR at 772-76.]  On October 2, 2012, a hearing was held, at which time
6    plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 825-46.]
7    A VE also testified.[2]  [AR at 842-46.]  On October 26, 2012, the ALJ issued a decision again
8    concluding that plaintiff was not under a disability since June 25, 2007, the date the application
9    was filed.  [AR at 756-64.]  When the Appeals Council denied plaintiff's request for review on
10   March 25, 2014 [AR at 741-43], the ALJ's decision became the final decision of the Commissioner.
11   See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action
12   followed.

14                                        **III.**

15                              **STANDARD OF REVIEW**

16            Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's
17   decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial
18   evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622
19   F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

20            "Substantial evidence means more than a mere scintilla but less than a preponderance; it
21   is such relevant evidence as a reasonable mind might accept as adequate to support a
22   conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation
23   and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)

---

25   [1]     The ALJ had relied on the opinion of a consultative examiner, Dr. Yang, who was
26   terminated by the agency as a consultative examiner in July 2009, for "duplicative and identical
     mental status examinations for multiple claimants."  [AR at 774-75 (internal quotation marks
     omitted).]

28   [2]     Although the ALJ indicates in the decision that a medical expert also testified [AR at 756],
     the ALJ stated at the hearing that the medical expert would not be testifying.  [AR at 829.]

(same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability

to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

If the claimant has a "severe" impairment or combination of impairments, the third step requires

the Commissioner to determine whether the impairment or combination of impairments meets or

equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

the claimant's impairment or combination of impairments does not meet or equal an impairment

in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled

and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to

perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a

prima facie case of disability is established.  Id.  The Commissioner then bears the burden of

establishing that the claimant is not disabled, because she can perform other substantial gainful

work available in the national economy.  Id.  The determination of this issue comprises the fifth

and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at

828 n.5; Drouin, 966 F.2d at 1257.

## B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

June 25, 2007, the application date. [AR at 758.] At step two, the ALJ concluded that plaintiff has

the severe impairments of degenerative disc disease involving the lumbar spine; degenerative joint

disease involving the bilateral knees; asthma; obesity; and a bipolar disorder.  [Id.] At step three,

the ALJ determined that plaintiff does not have an impairment or a combination of impairments

that meets or medically equals any of the impairments in the Listings.  [Id.] The ALJ further found

that plaintiff retained the residual functional capacity ("RFC")[3] to perform a range of light work as

---

[3]    RFC is what a claimant can still do despite existing exertional and nonexertional
limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
1151 n.2 (9th Cir. 2007) (citation omitted).

1  defined in 20 C.F.R. § 416.967(b),[4] as follows:

2  [C]an stand and or walk no more than four hours during an eight hour day and can
   occasionally climb ramps and stairs but not ladders, ropes or scaffolds.   The
3  claimant can occasionally balance, stoop, kneel, crouch and crawl but is unable to
   work around unprotected heights.   She should avoid concentrated exposure to
4  fumes, odors, dust, gasses and poor ventilation.   Mentally, the claimant can
   understand, remember and carry out simple job instructions and maintain attention
5  and concentration sufficient to perform simple, routine and repetitive tasks.   The
   claimant can have occasional interaction with coworkers, supervisors and the
6  general public and can work in an environment with occasional changes to the work
   setting and occasional work related decision-making.

7

8  [AR at 760.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded

9  that plaintiff is unable to perform her past relevant work as a hairstylist.  [AR at 763, 842-43.]  At

10  step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that

11  there are jobs existing in significant numbers in the national economy that plaintiff can perform,

12  including work as an "electronics worker" (Dictionary of Occupational Titles ("DOT") No. 726.687-

13  010), "packing machine operator" (DOT No. 920.685-082), and "mail clerk" (DOT No. 209.687-

14  026).  [AR at 764, 842-46.]  Accordingly, the ALJ determined that plaintiff was not disabled at any

15  time since June 25, 2007, the date the application was filed.  [AR at 764.]

16

17                                      **V.**

18                            **THE ALJ'S DECISION**

19        Plaintiff contends that the ALJ erred when he:  (1) considered the opinions of plaintiff's

20  treating sources, Ezzat Nashed, M.D., and Daniel Padua, III, M.D.; and (2) failed to comply with

21  the District Court remand order to properly consider plaintiff's subjective symptom testimony.

22  [Joint Stipulation ("JS") at 4.]

23  _____

24      [4]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
   objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this
25  category when it requires a good deal of walking or standing, or when it involves sitting most of the
   time with some pushing and pulling of arm or leg controls. To be considered capable of performing a
26  full or wide range of light work, you must have the ability to do substantially all of these activities. If
   someone can do light work, we determine that he or she can also do sedentary work, unless there are
27  additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20
   C.F.R. § 416.967(b).
28

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

**A.     MEDICAL OPINIONS**

**1.     Legal Standard**

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 416.902, 416.927. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct."  Id.

**2.     Dr. Nashed**

On December 14, 2010, Dr. Nashed, plaintiff's treating physician, completed a Medical Opinion Re: Ability to Do Work-Related Activities (Physical), designed to determine plaintiff's ability

1   to do work-related activities on a day-to-day basis in a regular work setting.  [AR at 632-34.]

2          On this check-the-box type form, Dr. Nashed indicated that plaintiff could lift and carry less

3   than ten pounds frequently and occasionally; stand and walk less than two hours; sit about four

4   hours with normal breaks; must alternate sitting and standing or walking every thirty minutes; can

5   stand about ten minutes before changing position; must walk around for five minutes every fifteen

6   minutes; needs to be able to shift at will from sitting or standing/walking; will sometimes need to

7   lie down at unpredictable intervals during a work shift; can occasionally twist, stoop, crouch, and

8   climb stairs or ladders; has limitations on feeling, and pushing/pulling; and should avoid

9   concentrated exposure to cold, heat, wetness, humidity, noise, fumes, and hazards such as

10  machinery or heights.  [Id.]  He indicated that he based his findings on plaintiff's lumbar muscle

11  spasm and decreased range of motion, and also noted plaintiff has pain on "standing or walking."[5]

12  [AR at 633.]

13         The ALJ rejected the opinions of Dr. Nashed:

14         The medical opinion concerning the claimant's physical ability to perform work
           related activity solicited by the claimant's representative at Exhibit 21F appears on
15         a preprinted form through a series of checked boxes without any specific clinical or
           objective support.  Not only does it fail to provide objective support for the assessed
16         limitations but the preparer fails to favor the reader even with a diagnosis.  The
           functional limitations are grossly embellished and exaggerated, unsupported by the
17         preparer's own treatment notes (p. 1 concerning standing and walking limitations),
           inconsistent with the totality of the medical evidence of record and patently tailored
18         to establish the claimant's inability to work.

19  [AR at 762.]

20         Plaintiff contends that the ALJ erred by failing to state the weight given to Dr. Nashed's

21  opinion, and by not providing specific and legitimate reasons supported by substantial evidence

22  of record for rejecting his opinion.  [JS at 5.]  She argues that the ALJ "merely sets forth a

23  summary of conclusory reasons for rejecting Dr. Nashed's opinion," and did not "'set forth his own

24  interpretations and explain why they, rather than the doctors', are correct.'"  [AR at 7 (citing

25  Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).]  The Court disagrees.

26

27  _____

28         [5]   Plaintiff contends the handwritten note indicates "pain on standing and swelling."  [JS at 5
    (citing AR at 633).]  The difference is immaterial.

First, the ALJ rejected Dr. Nashed's opinion because it was a check-the-box form without any clinical or objective support, including his own treatment notes, or even a diagnosis. [AR at 762.] An ALJ is entitled to reject a "treating physician's opinion that is conclusory and brief and unsupported by clinical findings" as well as a "check-off report[] that [does] not contain any explanation of the bases of [its] conclusions." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctors' opinions because they were contained in check-off reports that did not contain any explanation of the bases for the conclusions). In this case, as noted by the ALJ, the form Dr. Nashed completed did not even contain a diagnosis. See Ukolov v. Barnhart, 420 F.3d 1002, 1006 (9th Cir. 2005) (stating that Social Security Ruling ("SSR")[6] 96-6p provides "that a medical opinion offered in support of an impairment must include 'symptoms [and a] *diagnosis*'") (citing Soc. Sec. Ruling 96-6p) (alteration and emphasis in original). This was a specific and legitimate reason to discount Dr. Nashed's opinion.

Next, an ALJ is not required to accept a medical opinion that is inadequately supported by medical findings. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (an ALJ may discount treating physicians' opinions that are conclusory, brief, unsupported by the record as a whole or by objective medical findings); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) (ALJ may reject the conclusory opinion of a treating physician if the opinion is unsupported by clinical findings); Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports).

Here, the ALJ did not err in finding that Dr. Nashed's opinion was unsupported by any specific clinical or objective evidence. Even Dr. Nashed's ten treatment notes dated from October 14, 2009, through February 2011, contain little in the way of diagnoses -- almost all of them report

---

[6]   The Commissioner issues SSRs "to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the [Social Security Administration]. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (internal citations omitted).

1  only that plaintiff has "back pain." [See, e.g., AR at 606, 609, 611, 613 (a September 15, 2010,

2  note, also indicating muscle spasm), 615, 617, 619, 621, 629, 631.] Five of the notes state a little

3  more than this. For instance, on October 14, 2009, plaintiff complained of back pain in the upper

4  back, and could walk, but not bend over, which Dr. Nashed did not address in his treatment plan

5  [AR at 628-29]; on May 17, 2010, plaintiff complained of "lower back pain, can walk a little, hurts

6  on walking," for which Dr. Nashed suggested referral to a physical therapist and weight loss [AR

7  at 618-19]; on September 15, 2010, plaintiff complained of knee and back pain and that she

8  "cannot walk, cannot bend over, muscle spasm in back," for which Dr. Nashed prescribed "weight

9  loss, naprosyn, plaquenil, aspercreme, soma, and vicodin" [AR at 612-13]; on December 14, 2010

10  -- the same date he completed the check-box opinion -- plaintiff complained of back and knee

11  pain, Dr. Nashed noted that plaintiff "can[7] walk, bend over, can stand for 5 minutes," and

12  recommended weight loss and a refill on her medications [AR at 608-09]; and, on February 16,

13  2011, plaintiff stated she had low back pain that was 8 on a scale of 10, and could not bend over,

14  for which Dr. Nashed suggested referral to an orthopedist. [AR at 605-06.]

15      On examination at each of these ten visits, Dr. Nashed noted "abnormal" range of motion

16  only at four: March 17, 2010, May 17, 2010, December 14, 2010 (the same date he completed

17  the functional limitation form), and February 16, 2011. [AR at 605, 608, 618, 620.] Dr. Nashed

18  failed to quantify his findings in any way, or to discuss the severity of the decrease in range of

19  motion, and there is no evidence of any other clinical testing. Even at those four visits, Dr. Nashed

20  failed to find any abnormality in plaintiff's spine, and he never indicated any abnormal findings

21  related to her extremities, or her neurological examinations. [AR at 605-28.] Moreover, even

22  though plaintiff presented with back pain at every visit [see, e.g., AR at 605, 608, 610, 612, 614,

23  616, 618, 620, 628, 630], Dr. Nashed's treatment plan included only such things as medication,

24  heat application, massage, weight loss, and, at the most recent visit in February 2011, referral to

25  an orthopedist. [See, e.g., AR at 606, 609, 611, 613, 615, 617, 619, 621, 629, 631.] Accordingly,

26

27  _____

28      7    It is unclear, based on other notes, whether perhaps this was a typographical error and should have read "*cannot* walk." [AR at 608.]

although Dr. Nashed's check-box opinion suggests that plaintiff has significant limitations as supported by a decreased lumbar range of motion and muscle spasm, the ALJ did not err in finding that there is no objective evidence in Dr. Nashed's treatment records to support the severity of Dr. Nashed's findings.

The ALJ also found Dr. Nashed's opinion to be inconsistent "with the totality of the medical evidence of record." [AR at 762.] Indeed, consulting examiner Dr. Moazzaz[8] and State agency physician Dr. Taylor-Holmes (whose December 4, 2009, opinion was given "significant weight"), both opined that plaintiff could perform a range of light work, as reflected in the ALJ's RFC. [AR at 762 (citing AR at 541-45, 546-50.] Dr. Moazzaz conducted a comprehensive examination, and stated specific findings relating to plaintiff's cervical range of motion; range of motion of her extremities; thoracolumbar range of motion; straight leg raising; range of motion of the lower extremities; pulses; thigh, calf, arm, and forearm measurements; grip strength; neurological examination, including motor strength and sensation; reflexes; and also considered the results of x-rays of plaintiff's right and left knees. [AR at 546-50.] When an examining physician provides independent clinical findings that differ from the findings of the treating physician, such findings are substantial evidence. Tonapetyen, 242 F.3d at 1149; Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). On March 17, 2010, the reviewing physician, Joel Ross, M.D., agreed with Dr. Taylor-Holmes' opinion regarding a reduced range of light work. [AR at 576.] The consultative examiner in September 2007, and the State agency physician in February 2008, also found plaintiff could perform a reduced range of light work. [AR at 157, 183-84.] Plaintiff points to no other evidence

_____

8    Although the ALJ thoroughly discussed Dr. Moazzaz' findings, the ALJ did not otherwise state the weight given to the opinion of Dr. Moazzaz. [AR at 761-62.] The ALJ did state that "[i]n addressing the findings of Dr. Moazzaz the consultative orthopedic examiner at Exhibit 26F, the undersigned gives no weight to her statement concerning severe limitations in the ability to respond to work pressure." [AR at 762.] However, Exhibit 26F is the report of Dr. Bagner, and it was Dr. Bagner, the consultative *psychiatric* examiner, who rendered that opinion. [AR at 1075.] The Commissioner notes that Dr. Moazzaz' findings were reflected in the RFC, and that Dr. Taylor-Holmes found Dr. Moazzaz' opinion to be "consistent with plaintiff's longitudinal, clinical history, examinations, and imaging . . . ." [JS at 12 (citing AR at 546-52).] In addition to the limitations set forth by Dr. Moazzaz, Dr. Taylor-Holmes also opined that plaintiff should never climb ladders, ropes, or scaffolds, limitations the ALJ also included in his RFC determination. [Id. (citing AR at 548, 760).]

in the record that is consistent with or supports Dr. Nashed's more extreme limitations. Accordingly, the ALJ properly relied on the opinions of Dr. Moazzaz, albeit implicitly, and Dr. Taylor-Holmes, and there was no error in his finding that Dr. Nashed's opinion was not supported by the record as a whole.[9]

Based on the foregoing, the ALJ set forth multiple, legally sufficient reasons for giving Dr. Nashed's opinion less weight, and giving greater weight to the opinions of Dr. Moazzaz and Dr. Taylor-Holmes.  There was no error.

### 3.    Dr. Padua

On December 3, 2010, Dr. Padua, a staff psychiatrist at Victor Valley Counseling Center, completed a Short-Form Evaluation for Mental Disorders based on a mental status examination of plaintiff conducted on November 23, 2010.  [AR at 1066-69.]  Dr. Padua indicated that he had been treating plaintiff since September 25, 2007, monthly, as needed, and had last seen her on November 23, 2010.  [AR at 1066; see also AR at 1044-65 (treatment notes).]  Dr. Padua diagnosed plaintiff as bipolar with psychotic features.  [AR at 1066.]  His mental status examination reflected the following:  poor hygiene; agitation; rapid speech; guarded behavior; and a behavior disturbance that was aggressive and violent.  [AR at 1066-69.]  He noted that plaintiff was oriented on the date of the examination; her concentration was severely impaired; her remote memory was severely impaired; she exhibited below average intelligence; her mood was depressed; her affect was flat; she reported auditory and visual hallucinations, including hearing "constant voices that are bothersome at times"; her thought processes were tangential and loose; she had delusions of grandiosity; exhibited suicidal preoccupations; and her judgment was intact.  [AR at 1066-69.] Dr. Padua concluded that plaintiff's prognosis was "guarded," and her capacity was "poor" for the following work-related tasks:  ability to understand, remember and carry out simple and complex

---

[9]    Because the Court finds that substantial evidence supported the ALJ's rejection of Dr. Nashed's opinion, the Court need not discuss the ALJ's opinion that Dr. Nashed's opinion grossly exaggerated or embellished plaintiff's limitations and was patently tailored to establish plaintiff's inability to work, or that the ALJ had a duty to recontact Dr. Nashed.

1  instructions; maintain concentration, attention and persistence; perform activities within a schedule

2  and maintain regular attendance; complete a normal workday or workweek without interruptions

3  from psychologically based symptoms; and respond appropriately to changes in a work setting.

4  [AR at 1068-69.]

5       The ALJ summarized Dr. Padua's findings and discounted his opinion:

6       This "short form of mental disorders" is completely devoid of any diagnostic testing
   or appropriate measurements.  For example, the claimant was noted to be below

7       average in intelligence yet no psychological testing such as administration of the
   WAIS was performed.   The assessment was based entirely on subjective

8       interpretation and is entirely inconsistent with the totality [of] the medical evidence
   of record.

9

10  [AR at 762.]

11       Plaintiff contends that the ALJ erred by failing to state the weight he gave to Dr. Padua's

12  opinion, and because he did not provide specific and legitimate reasons supported by substantial

13  evidence for rejecting those opinions.  Specifically, plaintiff contends the ALJ's reasons were

14  conclusory; did not take into consideration the length, nature and/or extent of the treating

15  relationship; did not provide any evidence to support the conclusion that Dr. Padua's opinion is

16  "based entirely on subjective interpretation"; and erred in concluding that Dr. Padua's opinion is

17  inconsistent with the totality of the medical evidence of record.  [JS at 18-20.]  The Court

18  disagrees.

19       A review of Dr. Padua's treatment records shows he saw plaintiff approximately every two

20  months between October 1007 and August 2008, and then monthly through June 2012.  [AR at

21  528-40, 579-99, 1044-65.]  Despite this long history of treatment, there is no evidence that Dr.

22  Padua ever conducted a mental status examination other than the one in November 2011, or that

23  he administered any other diagnostic psychological or psychiatric tests.  [See, e.g., AR at 579-99,

24  1045-65.]  "The more a medical source presents relevant evidence to support an opinion,

25  particularly medical signs and laboratory findings," the more weight the ALJ will give it.  See 20

26  C.F.R. § 416.927(c)(3).  Moreover, an ALJ may discount a treating physician's opinions that are

27  conclusory, brief, or unsupported by the record as a whole or by objective medical findings.

28  Batson, 359 F.3d at 1995.  Here, Dr. Padua presented no relevant evidence in the way of medical

1    signs or clinical diagnostic findings to support his opinion.  Thus, the ALJ's determination that Dr.

2    Padua's opinion "is based entirely on subjective interpretation," and that he conducted no

3    diagnostic testing to support his opinions, including his opinion that plaintiff was of below average

4    intelligence,[10] is a specific and legitimate reason to discount Dr. Padua's opinion, notwithstanding

5    the length, nature, and extent of his treating relationship with plaintiff.

6         Plaintiff also argues that Dr. Padua's Global Assessment of Functioning ("GAF") score of

7    50, assessed on July 14, 2009, and the GAF score of 55 assessed by consultative examiner

8    Ernest A. Bagner, III, M.D. on August 9, 2012, support Dr. Padua's December 2010 opinion.  [JS

9    at 20-21 (citing AR at 538, 1074).]  A GAF score is the clinician's judgment of the individual's

10   overall level of functioning; it is rated with respect only to psychological, social, and occupational

11   functioning, without regard to impairments in functioning due to physical or environmental

12   limitations.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV").

13   A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in

14   social, occupational, or school functioning, e.g., unable to keep a job, and a GAF score of 55 is

15   indicative of moderate symptoms or moderate difficulty in social, occupational, or school

16   functioning.  DSM-IV 34.  However, the ALJ has no obligation to credit or even consider GAF

17   scores in the disability determination.  See 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) ("The

18   GAF scale . . . does not have a direct correlation to the severity requirements in [the

19   Commissioner's] mental disorders listings."); see also Howard v. Comm'r of Soc. Sec., 276 F.3d

20   235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in

21   formulating the RFC, it is not essential to the RFC's accuracy.").

22        Here, even if Dr. Bagner's moderate GAF score of 55 supports Dr. Padua's opinion, the

23   GAF scores of Dr. Padua and Dr. Bagner are still inherently based on their subjective

24   interpretations.  Of note, the most recent edition of the DSM "dropped" the GAF scale, citing its

25   "conceptual lack of clarity" and "questionable psychometrics in routine practice."  Diagnostic and

_____

27        [10]   In contrast, plaintiff's records from her involuntary admission to Community Hospital reflect
28   that plaintiff's IQ is "above average," although there is no indication that that facility did any clinical
     diagnostic testing of plaintiff's intelligence.  [AR at 637.]

Statistical Manual of Mental Disorders 16 (5th ed. 2012).  Additionally, together with Dr. Bagner's assessed GAF score of 55, Dr. Bagner also determined that plaintiff is only mildly limited in her ability to follow simple oral and written instructions, and comply with job rules; moderately limited in her ability to follow detailed instructions, interact with the public, coworkers, and supervisors, and respond to changes in a routine work setting; and severely limited in her ability to respond to work pressure in a usual work setting.  [AR at 1074-75.]  Thus, Dr. Bagner's assessed functional limitations are not consistent with Dr. Padua's more extreme limitations.

Plaintiff also argues that her January 21, 2011, through January 24, 2011, involuntary admission to Community Hospital of San Bernardino provides evidence to support Dr. Padua's opinion.  [JS at 20 (citing AR at 637-70).]  On admission, plaintiff stated that she had stopped her medications "10 days ago," and was starting to get "sick, more angry, upset, frustrated, feels like hurting people, feels like hurting herself, felt totally out of control [and] also has been hearing voices telling her to do things."  [AR at 637.]  She was diagnosed with bipolar disorder, manic, severe, and assessed a GAF score of 20 upon admission, and 45 on discharge.  [Id. (citing AR at 637-70).]  As admitted by plaintiff, however, throughout the rest of the record she is reported to have been compliant with her medications.  [JS at 21.]  As such, this hospitalization appears to be a singular event brought about by plaintiff's one instance of medication noncompliance and, therefore, does not constitute substantial evidence to support Dr. Padua's opinion.

The ALJ apparently relied on Dr. Bagner's opinion in finding that plaintiff had some mental functional limitations and included those limitations in the RFC determination.  As noted above, Dr. Bagner opined that plaintiff was severely limited in her ability to respond to work pressure in a usual work setting[11]; moderately limited in her ability to follow detailed instructions, interact with the public, coworkers, and supervisors, and respond to changes in a routine work setting; and

---

[11]   Although the ALJ initially indicated that the mental RFC supported this severe limitation [AR at 759], later in the decision the ALJ noted that he gave "no weight" to the statement of the consultative examiner "concerning severe limitations in the ability to respond to work pressure." [AR at 762 (see also supra n.8).]  However, it appears that the RFC limitations to simple, routine and repetitive tasks, occasional interaction with others, occasional changes in the work setting, and occasional work-related decision making, all take this limitation into account at least to some extent.

mildly limited in her ability to follow simple oral and written instructions, and to comply with job rules, such as safety and attendance. [AR at 1074-75.] Accordingly, the ALJ limited plaintiff to simple, routine and repetitive tasks; occasional interaction with coworkers, supervisors, and the general public; occasional changes in the work setting; and occasional work-related decision making. [AR at 760]; see Tonapetyan, 242 F.3d at 1149 (examining physician's opinion alone constitutes substantial evidence when it rests on his own independent examination of the claimant).

Accordingly, the ALJ provided specific and legitimate reasons supported by substantial evidence for giving Dr. Padua's opinion no weight.[12]

## B.   COMPLIANCE WITH REMAND ORDER REGARDING CREDIBILITY

On remand, the ALJ was directed to do the following:

> Articulate how she has evaluated the credibility of the claimant's subjective complaints . . . .   The Administrative Law Judge will give "specific reasons for the finding on credibility, supported by the evidence in the case record." These reasons must be "sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." The adjudicator must also consider the seven factors set forth in the [United States District Court ruling in case number CV 11-1612 (PLA)].

[AR at 775.] Specifically, the parties stipulated to the ALJ's reevaluation of plaintiff's credibility based on the ALJ's evaluation of the medical opinions of Drs. Moazzaz, Taylor-Holmes, and Gregg, and the new psychological consultative examination to be obtained on remand, and ultimately conducted by Dr. Bagner. [See AR at 783.] Plaintiff contends the ALJ failed to comply with the remand order. [JS at 29-33.] The Court agrees.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to

---

[12]   Because the Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence to reject Dr. Padua's opinion, the Court need not discuss plaintiff's contention that the ALJ had a duty to recontact Dr. Padua. [JS at 22.]

produce the pain or other symptoms alleged.'" Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of her symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. §§ 404.1529(c), 416.929(c).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not find "affirmative evidence" of malingering [see generally, AR at 758-63], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, 725 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).  "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id. at 1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted).  The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted).  A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346.  As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

In this case, at the October 2, 2012, hearing, plaintiff testified to the following:  she lives with her boyfriend who does the household chores such as cooking, cleaning, laundry and dusting; she does not drive, but takes the bus about two times a month to go to the doctor; she is bipolar

and two or three times a day she hears voices telling her to hurt others or herself; her medications

for controlling the voices work sometimes, but her body gets used to them and they need to be

changed; she is afraid that in a work environment she might hear the voices and "end up hurting

people"; she has hurt herself before, and tried to hurt her boyfriend and her sister; stress brings

on the voices; she had an involuntary hospitalization in January 2011 as a result of her mental

health impairment; she had surgery for her bad knees and takes prescription medication for the

swelling, and can't bend or squat; she can stand for 30-45 minutes; she has only a "little bit" of a

problem with sitting; her "back is really out of whack," such that she cannot bend over; she takes

pain shots and Vicodin for her back; the shots help control her pain for a "couple of days" but she

does not get them any more because she has new insurance that does not cover them; she has

asthma and cannot walk far after taking her inhaler; she finds it hard to shower, and sweep or mop

the floor because of her back pain; and she does not get along with other people and has no

friends.  [AR at 829-41.]  In her August 1, 2007, Function Report, plaintiff also stated that she

sometimes goes shopping; takes care of children; prepares fast and easy meals daily; goes

outside "maybe twice a week" when she needs to go shopping for food; someone goes with her

to the store to help her carry things; she goes to church maybe once a month; she has severe

mood swings; she can only walk a block then needs to stop for two or three minutes because her

"knees hurt real bad"; she can "sometimes" pay attention for a "long time"; she gets along with

authority figures because she has "no choice not to[]"; and when stressed, she goes to bed and

sleeps.  [AR at 115-21.]

Finding that plaintiff's statements concerning the intensity, persistence, and limiting effects

of her symptoms were not credible to the extent they are inconsistent with the RFC, the ALJ stated

the following:

> The medical evidence of record fails to support her allegations.  The claimant is
> morbidly obese and there is no thyroid origin responsible for her obesity which is
> merely a reflection of caloric intake in excess of caloric expenditure.  If the claimant
> truly perceived significant back and bilateral knee pain, she would be expected to
> ameliorate it through weight reduction to reasonable levels through exercise and
> dietary discretion which has [sic] obviously failed to do.  Her obesity further fails to
> impose greater functional limitations than that found herein.  The claimant's asserted
> lack of activities of daily living is purely volitional.  If the claimant chooses to lead
> and [sic] entirely indolent and unproductive lifestyle, it is certainly not required by

1
2
any demonstrated medical pathology documented anywhere in the record. Her medical conditions, taken singly or in combination are minimally remediable with use of conservative medical management including medication and there is no indication that surgical intervention is anticipated.

3

4    [AR at 762-63.]

5        Other than a brief mention of some of plaintiff's subjective symptom testimony when

6    discussing the severity of plaintiff's mental impairment,[13] the ALJ did not otherwise set forth any

7    of plaintiff's specific statements regarding her pain and other symptoms. Instead, he first made

8    a broad and sweeping statement that the medical evidence does not support plaintiff's allegations,

9    without citation to any of plaintiff's specific allegations or the medical evidence that he found did

10   not support those allegations. This is not sufficient. Burrell, 725 F.3d at 1138.

11       Indeed, as described elsewhere in the ALJ's decision [AR at 761], with regard to plaintiff's

12   physical impairments the consultative orthopedic examiner, Dr. Moazzaz, noted plaintiff's

13   complaints of back and bilateral knee pain, treated with medication including Vicodin and soma

14   "without relief." [AR at 761 (citation omitted).] Dr. Moazzaz found tenderness in the midline and

15   paraspinal muscles of plaintiff's lumbar spine with restricted range of motion in flexion, extension,

16   right and left bending, moderate effusion in the right knee and decreased range of motion; positive

17   medial joint line tenderness, negative lateral joint line tenderness with positive patellofemoral

18   crepitus; mild effusion in the left knee with positive medial joint line tenderness and positive

19   patellofemoral crepitus; x-rays of the right knee demonstrated "advanced osteoarthritis with joint

20   space narrowing and the left knee demonstrated medial joint space narrowing and osteophyte

21   formation consistent with left knee degenerative joint disease; plaintiff was diagnosed with

22   "obesity, lumbar degenerative disc disease and bilateral knee degenerative joint disease; plaintiff's

23   obesity "further exacerbated her orthopedic condition"; and she did not require the use of a

24   handheld assistive device. [AR at 761 (citations omitted).] Dr. Taylor-Holmes, the reviewing

25   physician, noted that plaintiff was morbidly obese at 5'4" and 262 pounds, with a body mass index

26   _____

27   [13]   The ALJ mentioned that plaintiff testified that she does not get along with others, stays

28   home and watches television, cannot do much because of her back and knee problems, does not have any friends and poor relationships with her family, and lives with her boyfriend. [AR at 759.]

of 45%, and degenerative joint disease involving both knees, as well as chronic back pain.  [Id. (citation omitted).]  Furthermore, as discussed above, Dr. Nashed's treating notes also support plaintiff's constant complaints of knee and back pain, as well as muscle spasms.  Thus, the ALJ's otherwise unsupported statement that the medical evidence does not tend to support plaintiff's unspecified allegations is not sufficiently specific enough for this Court to conclude that the ALJ rejected plaintiff's testimony on permissible grounds and did not arbitrarily discredit her testimony regarding pain and resulting limitations.

The same is true for plaintiff's subjective symptoms relating to her mental health impairment.  Plaintiff was diagnosed by Dr. Padua with bipolar disorder with psychotic features [AR at 1066], and the consulting psychiatrist, Dr. Bagner, also diagnosed plaintiff with bipolar disorder, not otherwise specified.  [AR at 1074.]  To the extent the Court can decipher Dr. Padua's handwritten treatment notes, they reflect that she hears voices three to four times a day [AR at 530]; she experiences moodiness [AR at 579]; she gets scared on the bus [id.]; she stays home [AR at 581]; she does not get along with anybody [id.]; she gets irritable over little things and has racing thoughts [AR at 582, 587]; her medications made her sleepy [AR at 586]; and she has no friends and does not get along with people.  [AR at 588.]  Thus, the ALJ's otherwise unsupported statement that the medical evidence does not tend to support plaintiff's unspecified mental health subjective symptom testimony, is not sufficiently specific for this Court to conclude that the ALJ rejected plaintiff's testimony on permissible grounds and did not arbitrarily discredit her testimony regarding her symptoms and limitations resulting from her bipolar disorder.

Next, the ALJ chastised plaintiff for her weight and her failure to control it through exercise and "dietary discretion."  [AR at 762-63.]  Without any supporting citation to the record, he conclusorily states that there is "no thyroid origin responsible for [plaintiff's] obesity," if she really had significant knee and back pain she "would be expected to ameliorate it" through exercise and "dietary discretion," that plaintiff's lack of daily activity is "purely volitional," and that she has chosen to lead an "entirely indolent and unproductive lifestyle," not supported by any "medical pathology" in the record.  [Id.]  The ALJ may not substitute his own opinion for that of the competent medical opinions in the record.  [Id.]; Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996)

("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion") (citation and internal quotation marks omitted); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record). Indeed, the ALJ does not otherwise support these conclusory findings with any evidence in the record, nor does he find plaintiff to be a malingerer or cite to any evidence to suggest that plaintiff was exaggerating her symptoms. As such, the ALJ's unsupported observations relating to plaintiff's obesity, and his spurious conjecture regarding her alleged lifestyle choices, not only have little to no bearing on plaintiff's credibility but are little more than an *ad hominem* attack on plaintiff's character, which fails to bolster the ALJ's credibility determination in any way.

Finally, the ALJ concludes that plaintiff's impairments are "minimally remediable" with "conservative medical treatment including medication," and that there is no indication that surgical intervention is needed. [AR at 763.] "Conservative treatment" has been characterized by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain." Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999). The Court is uncertain as to the meaning behind the ambiguous term "minimally remediable," and the ALJ provided no supporting explanation for this finding. Literally, it seems to state that plaintiff's impairments would improve only minimally with her medications -- which is probably the opposite of what the ALJ intended to convey.

Here, plaintiff testified that she is being treated with prescription medications for her physical and mental health impairments, that she previously had arthroscopic surgery on her knees, and that she previously received injections for her back pain -- but no longer gets those

injections because insurance does not cover them.  [AR at 832-34.]  She told Dr. Moazzaz that her medications provide no relief from her pain [AR at 541, 761], and the ALJ points to no instances in the record where plaintiff's medications are found to even "minimally" relieve plaintiff's pain.  On one occasion, plaintiff's mental impairments resulted in a three-day involuntary admission to the hospital.  [AR at 637-38, 836.]  The ALJ pointed to no evidence that plaintiff has refused to undergo injections, or to take prescription medications in order to relieve her pain or her mental health symptoms.  Additionally, the ALJ failed to point to anything in the record as evidence that plaintiff's symptoms were "minimally remediable" with her medications or other treatment, or that any specific surgical or "more invasive" procedures in addition to the treatment plaintiff was receiving (e.g., prescription pain medication to control plaintiff's pain and mental health symptoms), or had received in the past (e.g., arthroscopic knee surgery, injections to help control her pain), is a standard method for treating individuals with the type of pain caused by plaintiff's physical impairments.  Plaintiff need not be "utterly incapacitated" to be disabled.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (citations omitted).  Moreover, the Court is unaware of any requirement that a recommendation for "surgical intervention" is a necessary precursor to finding a claimant's subjective symptom allegations to be credible.

Based on the foregoing, the Court concludes that the ALJ failed to give "specific reasons for [his] finding on credibility, supported by the evidence in the case record."  [AR at 775.]  Nor were his stated reasons for rejecting plaintiff's subjective symptom allegations "sufficiently specific to make clear [or convincing] . . . the weight [he] gave to [plaintiff's] statements and the reasons for that weight."  [Id. (alterations added).]  Accordingly, the ALJ did not comply with the remand order and remand is warranted on this claim.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this

discretion to direct an immediate award of benefits.  See Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, because the ALJ failed to provide specific, clear and convincing  reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand shall reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.  Next, if necessary, the ALJ shall reconsider all of plaintiff's limitations in making his RFC determination.  Finally, the ALJ shall determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[14]

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it**

---

[14]  Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.

1   **intended to be included in or submitted to any online service such as Westlaw or Lexis.**

2

3   DATED: April 10, 2015

                                          PAUL L. ABRAMS

4                                         UNITED STATES MAGISTRATE JUDGE